

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES F. O'BRIEN AND THOMAS J. OBRIEN,

    Plaintiffs,

v.

ROGER L. O'NEILL,

    Defendants.

No. 1 C 7830

Wayne R. Andersen
District Judge

## MEMORANDUM, OPINION AND ORDER

Before the Court is defendant Roger L. O'Neill's ("Roger") motion for summary judgment. Plaintiffs James O'Brien and Thomas O'Brien, Roger's nephews, contend Roger breached his fiduciary duties as Trustee of a trust set up by his late father. For the reasons set forth below, defendant's motion for summary judgement is granted.

## BACKGROUND

The following facts are taken from the parties' statements of material facts. Frank and Marie O'Neill were married in the 1930s, and had three children: Roger, Diane, and Nancy. (First names are used throughout this opinion when referring to members of the O'Neill family to avoid confusion.) The family was traditional and close-knit; Marie was a homemaker and Frank a businessman. Frank, with a few partners, owned and ran Acme-Wiley, a sign company. On June 11, 1940, Frank established the Frank C. O'Neill Trust (hereinafter "the Trust"), establishing Marie as the sole income beneficiary. Roger's role as Trustee of the Trust thirty years later is the subject of this lawsuit.

At age 15, Roger began working with his father at Acme-Wiley. In 1961, a year after

Roger was graduated from college, he became an officer of Acme Wiley and purchased shares in the company. Sometime later that decade, he was made a director of the corporation. In 1966, Roger bought out the remaining shares held by his father's partners. After this transaction, Roger held 1,515 shares of Acme-Wiley stock. The remaining 3,605 shares were held by the Trust.

Frank's daughter Diane, who died in 1984, had five children, two of whom, James and Thomas O'Brien, are the plaintiffs in the present case. James briefly worked at Acme-Wiley during a high school summer vacation, and from 1977 to 1978. Thomas never worked at Acme-Wiley. Neither James nor Thomas ever purchased any shares in the company.

As Frank's children matured and Roger's involvement in Acme-Wiley grew, the Trust was amended. The original trustees of the Trust were Frank, Marie, and Loretta Patterson, Frank's secretary and a member of Acme-Wiley's Board of Directors. The terms of the Trust allowed Marie to amend the Trust with the consent of her children, who were to inherit the assets of the Trust upon Marie's death.

In 1963 the Trust was amended in ways immaterial to this case. On February 17, 1972, the Second Amended Trust was executed. The Second Amendment was initiated by Frank and agreed to by Marie, Diane, Roger, and Nancy, as required by the Trust. The Second Amendment established Marie as the income beneficiary of the Trust during her lifetime. Upon the latter of Marie's death or a reorganization of Acme-Wiley, the Trust was to break into three trusts giving Roger, Diane, and Nancy equal distributions, with one crucial exception. This exception provided Roger with an incentive to increase Acme-Wiley's value by establishing that:

> if the Donor's son, ROGER LEE O'NEILL, is then living, the Trustees shall allocate to the trust created for his benefit all of the common stock of Acme-Wiley Corporation, if any, then held by the Trust, but only such stock, regardless

2

of the fact that the value of such stock may be greater or less than the value of the assets allocated to the other trusts created pursuant to this paragraph.

In other words, if Roger ruined Acme-Wiley, he ruined his inheritance. But at the time of this Second Amendment, Roger was a secondary beneficiary, not a Trustee.

The Second Amendment also set forth that, if any of the original Trustees became unable to act, "the Donor's son, ROGER LEE O'NEILL shall act as a successor Trustee." At the time of the execution of the Second Amendment to the Trust, Roger was a director, officer, and minority shareholder of Acme-Wiley. His personal interests differed from those of the Trust, Acme-Wiley's majority shareholder. Nevertheless, the Trust explicitly allowed Roger to assume the position of Trustee, which he did at some point between February 17, 1972 and September 20, 1973.

On September 30, 1973 the Trust adopted a resolution accepting the offer of Acme-Wiley to tender 3,000 shares of common stock for 30 shares of preferred stock, leaving the Trust with 605 shares of common stock. Roger signed the resolution as Trustee. The parties both agree, however, that it was Frank who wanted to exchange the 3,000 shares of common stock for preferred stock. The plaintiffs do not contend that Roger instigated the issuance of the preferred shares, or that anything was improper about the 1973 resolution that accepted Acme-Wiley's offer concerning the preferred shares.

The 30 shares of preferred stock were redeemable by Acme-Wiley at any time for a set price and paid a set dividend, except no dividends were payable until Acme-Wiley's mortgage on specified property was paid in full. All dividends were cumulative from the date of the issuance of the preferred stock. When Acme-Wiley paid off its mortgage, it would either redeem the preferred shares at a set price, or pay cumulative dividends from 1973 to the time of

3

the mortgage payoff.

Shortly after the preferred stock was issued, revised financial statements and appraisals were submitted to Acme-Wiley which suggested the value of the preferred stock was substantially less than the common stock for which it was exchanged. To remedy this Acme-Wiley's articles of incorporation were amended, increasing both the dividend and redemption value of the preferred stock. After this amendment, the preferred stock paid a $1,350 cumulative dividend and had a $16,500 redemption value. The restriction that dividends only issue in the event the mortgage was fully paid off remained. As before, Acme-Wiley could redeem the preferred stock at any time. Likewise, the preferred shareholders could require the company to redeem their shares if adequate funds were legally available to the company.

In 1980 Roger had been an officer of Acme-Wiley for 19 years and President of the company for much of the preceding decade. That year, Karl Greiter, Acme-Wiley's Controller, approached Roger and said that, since the mortgage was about to be paid off, it was time to redeem the preferred shares. Roger gave Greiter permission to call John McDonough, a trusts and estates attorney at a major Chicago law firm. McDonough was the attorney for the Trust, and for Roger, Marie, and Ms. Patterson in their capacity as Trustees. McDonough, as attorney for the Trust, was concerned about the income-tax consequences of a redemption of the preferred shares. He explained that, if the preferred shares were redeemed at a time when the Trust still owned the 605 shares of common stock, the IRS would likely treat the redemption payment as a dividend and tax it as ordinary income. McDonough pointed out, however, that there was an exception that allowed for the significantly lower capital gains tax rate "if the redemption is in complete redemption of all the stock of the corporation owned by the shareholder." McDonough, consequently, "assumed that the redemption will not occur until

4

after the common stock has been fully distributed to Roger, so that the termination of interest test [was] satisfied."

Prior to Greiter's call to McDonough, Roger had never expressed any intention of obtaining the common stock held by the Trust. (We deem this admitted pursuant to Local Rule 56.1 because plaintiffs fail to cite to any admissible evidence to the contrary.) Roger confirmed in his deposition, and the evidence corroborated, that the Trust was amended in 1980 to account for the tax concerns raised by McDonough. No Acme-Wiley employee, O'Neill family member, or Trustee considered the transfer of the 605 shares of common stock until McDonough raised tax concerns regarding the redemption.

McDonough sent a letter to Marie in September of 1980 explaining that she could amend the Trust, with the consent of her children, in a manner that would distribute Acme-Wiley's common stock to Roger in return for the elimination of Roger and his descendants as beneficiaries of the Trust. The letter explained that the 605 shares of common stock had never paid a dividend, and as a minority stake could not force the company to pay a dividend. The letter went on to say that the value of the transfer of the 605 shares of common stock to Roger was substantially offset by the fact that Roger would never receive anything from the Trust originally set up for him and his sisters.

In response to McDonough's concerns, Marie and her children executed the Third Amendment to the Trust on October 6, 1980, which transferred the 605 shares of common stock to Roger, and eliminated him and his descendants as beneficiaries of the Trust. Roger, Nancy, and Diane signed the Amendment in their individual capacities, as was required for any amendment or alteration of the Trust. Prior to this amendment, Roger explicitly suggested that Diane and Nancy obtain independent financial and legal advice, yet they saw no reason to do so

5

and refused. Once the Third Amendment was executed by Diane, Nancy, Marie, and Roger, the distribution of the common stock to Roger was an action the Trustees were mandated to do; it was not a choice they made.

Acme-Wiley waited until after the common stock was transferred from the Trust to redeem the preferred shares. Neither party has given any reason for Acme-Wiley's delay in redeeming the preferred shares other than the obvious concern the company's president, Roger, had in minimizing a tax burden that would fall upon the Trust.

To redeem the shares Acme-Wiley paid the Trust $25,000 and issued a five-year promissory note that bore an 8% interest rate for the remaining $470,000. The plaintiffs challenged the adequacy of the 8% interest on the promissory note through an expert. This expert had no familiarity with Acme-Wiley's main customers, the sign industry, or Acme-Wiley's employees during the relevant time period. The expert presented no alternative investment that the Trustees should have expected to earn a higher rate of return and said he didn't "think there [was] any standard that [he] would be prepared to testify on" regarding the proper rate to discount the value of the note in 1980.

Ultimately, the 605 shares of common stock were transferred to Roger, Acme-Wiley redeemed the preferred shares, the Trust paid only the capital gains tax rate on the preferred stock redemption, and the principal and interest on the promissory note issued for the redemption of the preferred shares was paid in full. The plaintiffs contest none of these facts. A tax strategy was implemented, and that strategy was successful.

The basis of the plaintiffs' claim is that Roger breached his fiduciary duty while acting as Trustee of the Trust and exercised undue influence over, and concealed material facts from, his mother and two sisters. Plaintiffs claim that the Third Amendment was unauthorized and

6

that Roger enriched himself at the expense of his family. Roger's sister Diane, who died in 1984, was survived by five children, including the two plaintiffs. Roger's sister Nancy, has "no intention of bringing any claims against Roger for any alleged wrongdoing with respect to the [Third Amendment]." In her deposition, she said she didn't think her brother did anything wrong.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment may only be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party must present more than a scintilla of evidence to defeat summary judgment and may not rest upon "the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir. 1997).

## DISCUSSION

Under Illinois law, there are two ways a fiduciary duty can arise: 1) specific legal relationships such as attorney-client, principal-agent, or trustee-beneficiary; or 2) circumstances special to the parties relationship, "where one party places trust in another so that the latter gains superiority and influence over the former." *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663 (1st Dist. 1997), *see also In re Estate of Rothenberg*, 125 Ill. Dec. 739 (1988); Restatement (Second) of Agency §§ 1, 13, at 7, 58-60 (1958). Courts have stressed, however, that the "duty of loyalty owed by a trustee to a beneficiary is a trust relationship more intense than any other

fiduciary relationship." *Prueter v. Bork*, 105 Ill. App. 3d 1003, 1005 (1st Dist. 1981).

Generally, a trustee's fiduciary duty to the trust to carry out its terms with due care and to serve with complete and undivided loyalty precludes a trustee from placing themselves in a position of conflicted interest. *Childs v. Nat'l Bank of Austin*, 658 F.2d 487, 490 (7th Cir. 1981). However, when a conflict of interest is contemplated, created, or expressly sanctioned by a trust instrument, the conflict may be permitted to exist. *In re Estate of Halas*, 209 Ill. App. 3d 333 (1st Dist. 1991). When a trust expressly confers upon the trustee "the power to act in a dual capacity" or "knowingly place[s] the trustee in a position which might conflict with the beneficiaries" the rule of undivided loyalty is waived. *Dick v. Peoples Mid-Illinois Corp.*, 242 Ill. App. 3d 297 (4th Dist. 1993).

In this case, Roger's fiduciary duties stemmed from both his position as Trustee of the Trust, as well as from his special relationship with his sisters and mother, who relied upon him for business and financial advice. As an officer and shareholder of Acme-Wiley, Roger's interests conflicted with those of the Trust. However, these conflicts were contemplated and expressly condoned by the Trust, thereby allowing Roger to continue to serve both in his Trustee role, as well as in his role as President of Acme-Wiley.

The plaintiffs' opposition to the summary judgment motion relies upon the "two-step" transaction by which they claim Roger "not only deprived the Trust of $121,500 and future dividends, but stripped approximately two-thirds of the equity of Acme-Wiley from the Trust." The "two-step" transaction complained of was the amendment of the Trust to gift Roger the 605 shares of common stock, followed by the redemption of the preferred shares. The plaintiffs rely solely upon these two actions, not the 1973 resolution by the Trust accepting the 30 preferred shares in exchange for the 3,000 shares of common stock.

8

The plaintiffs' case relies on a faulty argument that significantly mischaracterizes the "two-step" transaction. While it may sound nefarious for the plaintiffs to label Roger's actions as those of a greedy trustee redeeming the preferred shares to gain control over Acme-Wiley, that ignores Roger's dual roles, which were explicitly condoned by the Trust. Roger did not redeem the preferred shares as a Trustee, he did so as President of Acme-Wiley. That he waited to execute the redemption until the Trust could adopt a sound tax strategy shows concern for the Trust, not bad faith.

It is beyond dispute that, once the Trust accepted preferred shares in exchange for common shares, the value of those shares was effectively capped at their redemption value. The plaintiffs complain that when Acme-Wiley, under Roger's leadership, redeemed the preferred shares, it paid only $495,000, not a price based on the book value of the company at the time of the redemption. But this argument ignores the terms under which the preferred shares were issued. When the preferred shares were issued they had a set redemption price. Either the company or the holder of the preferred shares could, if sufficient assets were available, redeem the shares for the redemption price. In any rational market, if the value of the preferred shares rose sharply above their redemption price, they would be redeemed by Acme-Wiley. Conversely, if the value of the preferred shares fell significantly below their redemption price, the shareholders would force the company to redeem them.

The redemption is not the plaintiffs' only complaint. In a somewhat quixotic argument, the plaintiffs fault Roger for following a tax strategy that worked, saving the Trust significant sums of money. The plaintiffs criticize the Third Amendment to the Trust, whereby 605 shares of common stock were gifted to Roger in exchange for terminating any interest he or his heirs had in the Trust. These 605 shares represented less than 12% of the 5,120 outstanding shares of

Acme-Wiley common stock. The holder of the 605 shares of common stock was without power to force the payment of a dividend. The plaintiffs have pointed to no market for sale of the 605 shares of common stock at the time of the Third Amendment. The only rational assumption at the time of the Third Amendment was that the 605 shares would never pay a dividend and would transfer to Roger per the terms of the Trust upon Marie's death.

Plaintiffs additionally assert that Roger carried out his duties in bad faith. We disagree. A plaintiff can establish bad faith if he can establish by clear and convincing evidence that the defendant failed to exercise ordinary care. *A.W. Huss Co. v. Continental Casualty Co.*, 735 F.2d 246, 250 (7th Cir. 1984). The record does not support that Roger acted improperly or beyond ordinary care, nor does it indicate that he violated the terms and directions contemplated by the Trust. Roger had dual and conflicting roles that were explicitly permitted by the Trust. As President of Acme-Wiley, he redeemed his preferred shares and as Trustee to the Trust, he waited to execute the redemption until the Trust could adopt a sound tax strategy. Acme-Wiley could have redeemed the preferred shares at any time. If done prior to the transfer of common stock, it would have resulted in a higher tax consequence for the redemption. Given the imminent redemption of the preferred shares and the 605 common share gift to Roger, it is sensible that Roger timed the redemption when he did. By gifting Roger the 605 shares of common stock and satisfying the "complete termination of interest" test, the Trust paid only the capital gains rate on the redemption proceeds. Although Plaintiffs argue the Trust should have kept the 605 shares of common stock, they were unlikely to ever pay a dividend or attract a willing buyer, and that retention would have forced an avoidable payment of a higher tax rate. Moreover, John McDonough undisputedly informed Roger that these transactions were legal.

In the same respect, Roger had a fiduciary duty to his mother and sisters and was unable

to change the terms of the Trust without their consent. When the Third Amendment was initiated, Roger accurately explained to his sisters and mother the effect of that Amendment and what it would mean for each of them financially. He further suggested that his sisters and mother retain outside counsel and financial advice to ensure they felt comfortable with the Amendment. Their refusal to obtain outside guidance indicates that they felt Roger was acting in accordance with the terms of the Trust and with Frank's intent. Frank O'Neill created the Trust and specifically delineated how the Trust could be altered or amended. Roger satisfied his father's wishes by following the directions of the Trust. We believe there is no material question of fact that would allow a jury to conclude that Marie, Diane, and Nancy's signatures were ineffective or that they did not knowingly consent to the Third Amendment.

The final argument raised by the defendants is that the interest rate on the note issued in return for the preferred shares was unreasonably low. We reject Plaintiffs' argument regarding the propriety of the interest rates. Plaintiffs admit that their expert did not analyze the risks associated with accepting a note from Acme-Wiley. This same expert flatly refused to provide any method for analyzing the proper interest rate for the note. Such evidence does not establish a genuine issue of material fact as to whether Roger violated his fiduciary duty by allowing a note to be issued carrying an interest rate of 8%.

It is abundantly clear to anyone who examines the facts that Roger acted with due regard for his mother, sisters, and fiduciary duties at all times. Plaintiffs' hyperbole and misleading rhetoric does not alter the fact that they are challenging a Trustee's acceptance of a favorable, and successful tax strategy, recommended by an extremely well-qualified trusts and estates attorney.

The law protects the transfer of wealth from one generation to another through probate

courts that enforce wills, the creation of trusts that protect assets for future generations, and duties placed upon those who oversee trusts and wills. The benefit of such legal creations inured to the plaintiffs, who received significant sums of money as a result of the work of their grandfather and uncle.

The law does not dictate how an individual or married couple must pass on their worldly possessions. That decision is left to the individual. Frank O'Neill decided Roger was entitled to benefit from any value that Roger added to the family business, where Roger had worked for decades prior to taking over the management of the company. Almost thirty-years later, two of Frank O'Neill's grandchildren have sued his son, attempting to gain from Roger's sale of the family business. The undisputed facts show that the plaintiffs have no legal or equitable right to recover money from Roger.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment [68] is granted. This is a final and appealable order.

It is so ordered.

_____
Wayne R. Andersen
United States District Court

Dated: *February 28, 2007*